IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE MIGUEL VASQUEZ, JR., | § | |
|      Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 1:13-242 |
| | § | |
| WILLIAM STEPHENS, | § | |
|      Respondent. | § | |

<u>REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE</u>

On December 18, 2013, Petitioner Jose Miguel Vasquez Jr. ("Vasquez"), through his retained attorney, filed a Petition for Writ of Habeas Corpus – pursuant to 28 U.S.C. § 2254 – by a Person in State Custody.  Dkt. No. 1.

On April 17, 2014, Respondent William Stephens, in his official capacity as Director of Texas Department of Criminal Justice – Correctional  Institutions Division (hereinafter "State") filed a motion for summary judgment in response to the petition. Dkt. No. 10.

After reviewing the record and the relevant case law, the Court recommends that the motion for summary judgment be granted.  Vasquez's challenge to his murder conviction is untimely filed and there is no basis for equitable tolling.  Moreover, because Vasquez claims actual innocence, the Court exams the merits of his case – as part of the timeliness issue. Whether evaluated as a procedural failure or upon their merits, Vasquez's claims entitle him to no relief.

## I. Background

### A. Factual Background

#### 1. Pretrial Matters

In February 2006, Vasquez was indicted for murder in the 107th Judicial District Court in Cameron County, Texas. Dkt. No. 9-54, p. 1.  Because Vasquez was indigent, counsel was appointed for him.  Vasquez later hired a local attorney, Larry Warner, to

represent him.  CR Dkt. No. 9-50, p. 1731.  Warner's first appearance in Vasquez's behalf was on March 2, 2007, at a pretrial hearing.  Id.

On November 8, 2007, Warner moved for a continuance. Dkt. No. 9-7, p. 64.  Because the State alleged – based upon the testimony of an eyewitness– that Vasquez stabbed the victim to death and then licked the knife, Warner also sought funds to hire an expert to test the knife for Vasquez's DNA.  Dkt. No. 9-7, Id, p. 65.  The Court granted both requests. Id, p. 71.

On February 21, 2008, the Court ordered Warner to provide the name of the DNA expert to the District Attorney's Office so the testing could be coordinated and completed. Dkt. No. 9-50, p. 1733.  On April 1, 2008, the Court signed an order, appointing Aliece Watts to serve as the DNA expert for the defense, at the state's expense.  Id.  On June 25, 2008, the Court issued an order, authorizing the payment of the expert and the lab. Dkt. No. 9-50, p. 1735.

On August 4, 2008, the trial began with jury selection. Dkt. No. 9-50, p. 1736.

On August 6, 2008, an emergency hearing was held regarding the DNA testing by the defense.  Dkt. No. 9-16, p. 302.  The State claimed that it had not received any copies of the test results.  Id.  At the hearing, Warner informed the Court that "Ms. Watts tells me that the lab, Orchid Cell Lab, did not do any testing, so I don't have any bench memoranda or anything from Orchid Cell, nothing." Id.

Warner further stated that Watts had informed him that she had looked at the DNA profile and that "there is a stutter." Dkt. No. 9-16, p. 303.[1]  Warner also explained that the DNA testing lab had recently moved from Texas to Utah, which also slowed the testing process. Id, p. 306.

---

[1] Without going too far into the details of the science of DNA analysis, a stutter is a DNA fragment that may occur as part of the testing process, when the DNA strand is unwound and "slips" during the testing process. Forensic DNA Applications: An Interdisciplinary Perspective 44 (Dragan Primorac & Moses Schanfield, eds., 2014).  Stutters present a risk of unreliable test results in cases like this because the tester needs to be able to determine whether a DNA fragment is a stutter from the victim or whether it came from an outside source.  The absence of a complete DNA strand makes this determination difficult, if not impossible.

### 2. Trial Testimony

According to the testimony of Ana Ayala – Vasquez's apparent girlfriend – she was with Vasquez, the victim George Garza, Ayala's friend Andres Garcia, and a few other people on the day of the murder. Dkt. No. 9-21, pp. 709-710.  The group was together for about half an hour and spent that time "getting high." Id, pp. 709-11.  Ayala testified that during this time, Vasquez told Garza that "he was going to kill him in less than two hours." Id, p. 711.  Ayala was in the other room, so she did not see or hear Garza's reaction. Id, pp. 711-712.  No one ever testified about why Vasquez intended to kill Garza and no motive is facially apparent from the record.

After getting high, Vasquez, Ayala, Garza, and Garcia traveled to Garcia's house in Garza's truck. Dkt. No. 9-21, p. 712.  Vasquez, Garza, and Garcia spent about 15 minutes together in the front yard talking, while Ayala stayed in the vehicle. Id, p. 713.  Garcia testified that Vasquez – who he had only known for about a week at that point – asked to borrow Garcia's car. Id, pp. 782-83.  Garcia told him that he wouldn't loan the car to Vasquez, but he would drive him where he wanted to go. Id.

Vasquez then returned to the truck and told Ayala that "he was going to get rid of this guy, George." Id, p. 714.  Ayala said that she didn't think Vasquez was serious about murdering Garza because she "didn't want to believe what he was saying." Id, pp. 714, 735.

Ayala testified that she drove Garza's truck – with Vasquez in it – to Oliveira Park, while Garza and Garcia followed in Garcia's vehicle. Id, p. 715.  Once at the park, Vasquez exited the truck, told Ayala to wait there and got into Garcia's vehicle. Id, p. 716.  Garcia then drove off with Garza and Vasquez in Garcia's vehicle, while Ayala waited. Id, pp. 716-717.

Garcia pulled out of the parking lot and drove "not even ten seconds" to a secluded street. Id, p. 788.  Garcia stopped the vehicle where Vasquez told him to; Vasquez and Garza exited the vehicle and walked "across the little canal," while Garcia remained in the driver's seat. Id, pp. 790-91.  Garcia was under the impression that Vasquez and Garza were going

3

to purchase some marijuana. <u>Id</u>, p. 790.

According to Garcia, he heard Vasquez and Garza arguing and exited the vehicle "to check what was going on." <u>Id</u>, p. 792.  Garcia testified that he saw Garza lying flat on his back with Vasquez kneeling over him and "beating him." <u>Id</u>, pp. 793-94.  Garcia could tell that Vasquez was on top because he could see Vasquez's "bald" head. <u>Id</u>, p. 793.  Garza was shouting in Spanish at Vasquez to "stop hitting me." <u>Id</u>, p. 795.

Garcia then returned to the car and "not even like three seconds [later], Vasquez got in the car, too." <u>Id</u>, p. 796.  Garcia said that Vasquez was breathing heavily and told him to take him back to the truck where Ayala was waiting. <u>Id</u>, p. 797.  Garcia said that the vehicle and surrounding areas were so dimly lit that he couldn't tell if Vasquez was bloody or dirty. <u>Id</u>, p. 798.  Garcia also admitted that he didn't want to "even look at" Vasquez, because he was "scared" that Vasquez might assault him next. <u>Id</u>, pp. 798-99.  Garcia drove Vasquez back to Ayala's truck and left Oliveira Park. <u>Id</u>.

Ayala testified that she got high on crack cocaine while she waited; on cross examination she stated that the crack cocaine did not alter her perceptions or recollection of that evening. <u>Id</u>, pp. 718, 733-34.  According to Ayala, Vasquez returned to Ayala's vehicle at some undetermined time and was "all full of blood" when he got back into the truck. <u>Id</u>, p. 717.  Ayala "look[ed] at him shocked." <u>Id</u>, p. 718.  Vasquez showed her a bloody knife, "licked it, closed it, put it on his lap and he said, 'Let's go.'" <u>Id</u>, p. 718-21.  Ayala identified the knife, that she had seen Vasquez lick, as the same one that she had seen Vasquez borrow from Garza earlier that day. <u>Id</u>, p. 720.  Vasquez further told her, "I killed him with his own weapon." <u>Id</u>, p. 721.

When they returned to Garcia's home, Vasquez washed himself down with a hose and put his blood-soaked clothing in a trash bag. Dkt. No. 9-21, p. 722.  He later told Ayala that he burned the clothes. <u>Id</u>, p. 723.

Later in the evening, Ayala and Vasquez met with Katrina Decker at the Tradewinds Motel so they could do more drugs. CR Dkt. No. 9-21, p. 725.

4

Katrina Decker testified that she had known Vasquez for a few weeks prior to the murder.  Dkt. No. 9-17, p. 355.  Decker testified that she knew him by the name "Pico," which she claimed was given to him because he was "known for stabbing people." <u>Id.</u> Decker witnessed Vasquez physically abusing Ayala for apparently cheating on him. <u>Id.</u> Decker testified that Vasquez told Ayala "that he had killed two people for her" and asked if "this is the way she repaid him." <u>Id</u>.  Not long after they arrived at the hotel, Decker left to go to work. <u>Id</u>, p. 369.

A little while later in the evening – having left work before her shift was completed – Decker returned to the hotel to find Vasquez "beating up" Ayala. Dkt. No. 9-17, p. 370. When Decker intervened, Vasquez threw Decker against the wall and put a knife to her neck before releasing her and putting the knife back in his pocket. <u>Id</u>, p. 372-73.

At around 3:00 a.m., Vasquez and Ayala knocked on Decker's hotel room door and asked for a ride to "go buy some crack cocaine." Dkt. No. 9-17, pp. 383-84.  Decker gave them a ride; on the way, they were pulled over by a police officer for running a red light. The police officer, who issued the citation, testified that he saw Vasquez in the back seat of the vehicle, acting nervous and fidgety. Dkt. No. 9-18, p. 423.

Vasquez later told Ayala that he had "lost the knife" in Decker's car. Dkt. No. 9-21, p. 729.  Despite searching for 15 minutes, Vasquez was unable to find the knife in Decker's vehicle. <u>Id</u>.

The next morning, Garza's body was found in a ditch close to Oliveira Park. Dkt. No. 9-22, p. 824.  Garza "had been stabbed multiple times in his back and chest area." <u>Id</u>, p. 825. At the scene, there were three sets of footprints leading to Garza's body, but only two sets going away from the body. <u>Id</u>.

Detective Cris Ortiz, with the Brownsville Police Department, testified that a witness placed Ayala and Vasquez in Garza's truck around the time of the murder. Dkt. No. 9-22, p. 841.  Not long after receiving this tip, Ortiz heard a police radio "call of an offense being committed in progress" where Ayala was identified as one of the perpetrators. <u>Id</u>, pp. 845-47.

After Ayala was arrested and detained, Ortiz interviewed her about Garza's murder. Id, pp. 847-48.  Ortiz testified that Ayala "gave me a fully detailed story of how the victim was killed." Id, p. 848.  Ayala also told Ortiz that Vasquez had apparently lost the knife in Decker's car. Dkt. No. 9-23, p. 887.

The officers investigating the murder found the knife in the car driven by Decker, which was parked outside of the hotel where Decker, Vasquez, and Ayala had been staying. Dkt. No. 9-19, pp. 526-27.  At the hotel, the officers also found Garza's ID card, cut up and placed in a garbage bag. Id, p. 531.  The officers also retrieved blood-stain evidence from the victim's vehicle. Id, p. 537.  Photographs of Vasquez taken two days after the murder show him with scratches and cuts on his hand, knees, head and ankles. Id, p. 580.

### 3. DNA Testing

The knife that was used to murder the victim, Garza, was tested for DNA. Dkt. No. 9-20, pp. 610-626.  The knife had DNA from two different people on it. Id.  The State's DNA expert testified that there was obvious DNA from the victim on the knife. Id, p. 629.  Indeed, according to the State's expert, there was a "1-in-200 quadrillion" chance that the DNA did not come from the victim. Id.

As to the other DNA found on the knife, there was much less DNA present. Id.  The expert testified that the second DNA found on the knife was consistent with Vasquez's, but acknowledged that there was a 1-in-8700 chance that it did not come from Vasquez. Id, p. 629.  The expert testified that "we can't say with any degree of certainty that [the] sample did come from [Vasquez], just that most people would have been excluded as contributors." Id, p. 630.  On cross-examination, the expert admitted that out of a sample size of one million people, "some[where] in the order of a hundred" people would match that DNA profile. Id, pp. 647-48.

Watts, the defense's DNA expert, testified that the DNA samples from the knife showed the presence of stutters. Dkt. No. 9-20, pp. 679-81.  Watts testified that based upon the presence of these stutters, "there could be more than one additional contributor[] on the

sample that was collected from the knife." Id, pp. 682-83.  Watts testified that the stutter "could be noise, it could be an allele . . . an allele could mean it was from somebody else." Dkt. No. 9-21, p. 693.  Watts did admit that she was unaware of any test that could reliably determine if a stutter was an actually DNA from another contributor. Id, pp. 693-94.

On cross-examination, Watts stated that she had requested that the evidence be sent to a lab for additional testing. Dkt. No. 9-21, pp. 699-700.  The testing did not occur because of "a communications breakdown" between Watts and Warner. Id.

### 4. Conviction and Sentence

On August 19, 2008, the jury found Vasquez guilty of murdering Garza. Dkt. No. 9-25, pp. 1070-72.

On September 22, 2008, Vasquez was sentenced to life imprisonment. Dkt. No. 9-26, p. 1090.

### 5. Direct Appeal

Vasquez proceeded pro se on appeal to the Court of Appeals for the Thirteenth Judicial District of Texas.  On April 2, 2009, he filed his appellate brief, raising eight claims, which the Court restates as five: (1) there was no proper foundation for the DNA evidence; (2) the DNA evidence was inadmissible because the tests were not conducted properly; (3) the prosecution failed to turn over DNA discovery material to the defense expert for testing; (4) his counsel was ineffective for failing to challenge the admissibility of the state's evidence; and (5) that the court reporter's record was neither accurate nor complete. Dkt. No. 9-31, p. 1230.

On November 4, 2010, the appellate court affirmed the trial court's judgment. Dkt. No. 9-37, p. 1599.  The appellate court found that Vasquez waived any issues regarding the foundation or admissibility of the DNA evidence by not raising such objections at trial. Id, p. 1603.  It further found that the State did turn over the DNA evidence to the defense, but that the defense did not have it tested. Id, p. 1603.  In rejecting the ineffective assistance of counsel claims, the court concluded that Vasquez had "not overcome the strong presumption

that counsel's conduct fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy." Id, pp. 1605-06.  Lastly, the appellate court was "unpersuaded that the record is incomplete or inaccurate." Id, p. 1607.

On February 23, 2011, Vasquez filed a petition for discretionary review with the Court of Criminal Appeals of Texas. Dkt. No. 9-41, p. 1630.

On June 8, 2011, the Court of Criminal Appeals "refused" Vasquez's petition for discretionary review. Dkt. No. 9-44, p. 1656.

The Supreme Court docket does not reflect Vasquez filing a petition for a writ of certiorari.

### 6. State Post Conviction Motions

On September 14, 2011, Vasquez filed a motion – pursuant to TEX. CODE CRIM. PROC. Art. 64.05 – seeking forensic DNA testing of the knife. Dkt. No. 9-45, p. 1662.  On November 29, 2011, the 107th District Court denied that motion. Id.

On January 9, 2012, Vasquez appealed the denial of the motion to the Thirteenth Appeals Court. Dkt. No. 9-45, p. 1657.  On February 16, 2012, the appellate court dismissed the appeal for want of jurisdiction, because it was untimely filed. Dkt. No. 9-46, pp. 1687-89.

On April 10, 2012, Vasquez filed two applications for writ of habeas corpus with the Court of Criminal Appeals. Dkt. No. 9-50, p. 1708; Dkt. No. 9-53, p. 1866.  In these applications, Vasquez made two overarching claims: (1) trial counsel was ineffective for failing to ensure that the DNA evidence was re-tested prior to trial; and (2) that Vasquez was entitled to re-testing of the DNA evidence under Article 64.05. Id.

On May 14, 2012, the 107th District Court issued findings of fact and conclusions of law, recommending that the petitions be denied. Dkt. No. 9-49, pp. 1696-99; Dkt. No. 9-52, pp. 1854-57.

On June 6, 2012, the Court of Criminal Appeals "denied" Vasquez's applications "on findings of trial court without hearing." Dkt. No. 9-50, p. 1704; Dkt. No. 9-53, p. 1862.

8

### B. Procedural History

On December 18, 2013, Vasquez[2] filed the instant petition for a writ of habeas corpus in this Court. Dkt. No. 1.   Vasquez asserts that counsel was ineffective for:  (1) failing to secure the re-testing of the DNA; and, (2) failing to call an alibi witness.  Vasquez also states that Armando Villalobos, the Cameron County District Attorney at the time of the trial and conviction, was convicted of corruption and that fact "raises sufficient doubt about [Vasquez's] guilt to undermine confidence in the result of the trial." Id, p. 19.

While Vasquez concedes that the petition is untimely filed, he argues that it should still be considered because he is claiming that he is actually innocent of the crime. Furthermore, Vasquez admits that his claims regarding the alibi witness and the corruption in the District Attorney's Office were not raised in the state courts; he asserts that because he was unrepresented by counsel on direct appeal and in his state habeas proceedings, this procedural default should be excused.

On April 17, 2014, the State timely responded to the petition. Dkt. No. 10.  The State asserts that the petition is untimely filed and cannot be saved by any exception to the timeliness requirement.

## II. Applicable Law

### A. Section 2254

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a prisoner convicted in a state court may challenge his conviction to the extent it violates "the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Accordingly, only violations of the United States Constitution or federal law are subject to review by this Court under § 2254.

In conducting such a review, a federal district court

may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the claim by the state court "(1) resulted

---

[2]  As identified earlier, Vasquez is represented by counsel in the instant petition.

in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding."

Riddle v. Cockrell, 288 F.3d 713, 716 (5th Cir. 2002) (quoting 28 U.S.C. § 2254(d)(1)-(2)).

"A decision is contrary to clearly established federal law under § 2254(d)(1) if the state court (1) 'arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law'; or (2) 'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent' and reaches an opposite result." Simmons v. Epps, 654 F.3d 526, 534 (5th Cir. 2011) (quoting Williams v. Taylor, 529 U.S. 362, 405 (2000)).

"The state court makes an unreasonable application of clearly established federal law if the state court (1) 'identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts'; or (2) 'either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Simmons, at 534 (quoting Williams, at 407).

**B. Timeliness**

A petitioner has a one year "period of limitation" in which to file a § 2254 petition. 28 U.S.C. § 2244(d)(1). That period runs from the latest of:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)-(D).  This one year period is tolled during the time in which "a properly filed application for State post-conviction or other collateral review" is pending in the state courts. 28 U.S.C. § 2244(d)(2).

Further, the limitations period is not jurisdictional and may be equitably tolled. Holland v. Florida, 560 U.S. 631, 645 (2010).  For equitable tolling to excuse the late filing of a petition, the petitioner must show that he has been "pursuing his rights diligently" and that "some extraordinary circumstance" prevented timely filing. Id. at 649.

Equitable tolling does not apply, however, where a state court petition is filed after the expiration of the one year period. Scott v. Johnson, 227 F.3d 260, 263 (5th Cir. 2000). Finally, the filing of a state petition does not serve to "revive an expired limitation period." Villegas v. Johnson, 184 F.3d 467, 472-73 (5th Cir. 1999).

A petitioner's untimely petition may still be considered if the petitioner can establish that he has a tenable claim of actual innocence. McQuiggen v. Perkins, 569 U.S. —, —, 133 S. Ct. 1924, 1928 (2013).  As a threshold, the petitioner must "present evidence of innocence so strong that a court cannot have confidence in the outcome of the trial." Id. at 1936 (internal quotations omitted).  Furthermore, actual innocence is not a freestanding claim for relief; the petitioner must also establish that prejudicial constitutional error occurred at trial. Id.

## III. Analysis

In analyzing Vasquez's claims, the Court must first determine if they are timely filed. If they are untimely filed, the Court must then determine if any exception applies to excuse the untimely filing.  The Court concludes that the claims are untimely filed and that no exception, excusing that untimely filing, has been shown.[3]

---

[3] While not addressing the merits of Vasquez's claims directly, the Court's resolution of Vasquez's claim of actual innocence establishes that Vasquez's claims are substantively meritless.

### A. Timeliness

As previously noted, Vasquez had one year in which to file his petition.  As relevant here, that one year period of limitation began to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).

On September 22, 2008, Vasquez was sentenced to life imprisonment. Dkt. No. 9-26, p. 1090.  On June 8, 2011 – after the appeals identified earlier – the Court of Criminal Appeals ultimately "refused" Vasquez's petition for discretionary review. Dkt. No. 9-44, p. 1656.

Vasquez had ninety days from that date to file a petition for a <u>writ</u> <u>of</u> <u>certiorari</u> with the Supreme Court of the United States. S.CT. R. 13(1)-(3).  The Supreme Court docket does not reflect Vasquez filing a petition for a <u>writ</u> <u>of</u> <u>certiorari</u>.  Thus, the deadline for Vasquez to file his petition was September 6, 2011.  When that deadline passed, Vasquez's conviction became final for habeas purposes. <u>Flanagan v. Johnson</u>, 154 F.3d 196, 197 (5th Cir. 1998). Given the one year limitation, Vasquez had until September 6, 2012, to file his habeas petition in this Court, absent any tolling.

Federal law provides that any claims properly pending in the state courts toll the limitations period. 28 U.S.C. § 2244 (d)(2).  On September 14, 2011, Vasquez filed a motion pursuant to TEX. CODE CRIM. PROC. ART. 64.05, seeking forensic DNA testing of the knife. Dkt. No. 9-45, p. 1662.  This motion is entitled to tolling as a form of collateral review of his conviction. <u>Hutson v. Quarterman</u>, 508 F.3d 236, 240 (5th Cir. 2007).

On November 29, 2011, the 107th District Court denied that motion. <u>Id</u>.  Vasquez had 30 days to file a notice of appeal, which gave him a deadline of December 29, 2011. Tex. R. App. P. 26.2(a)(1).  Instead of filing within the 30 day period, Vasquez filed his notice of appeal on January 9, 2012; the 41st day. Dkt. No. 9-45, p. 1657.  On February 16, 2012, the appellate court dismissed the appeal for want of jurisdiction because it was untimely filed. Dkt. No. 9-46, p. 1687, <u>citing</u> <u>Olivo v. State</u>, 918 S.W.2d 519, 522 (Tex. Crim. App. 1996) (the state appellate court's jurisdiction is invoked by a timely notice of appeal).

12

It is not clear that Vasquez is entitled to have the entire period that his motion was pending – from September 14, 2011 until February 16, 2012 – tolled, given that the appeal was untimely filed. Nevertheless, in an abundance of caution, the Court will treat the limitations period as tolled for the entire time the motion was pending, including the resolution of the untimely appeal.[4] Under this approach, Vasquez would be entitled to tolling from September 14, 2011 (the filing of the motion) until February 16, 2012 (the appellate court's rejection of the untimely appeal) for a total of 156 days.

On April 10, 2012, Vasquez filed two applications for writ of habeas corpus with the Texas Court of Criminal Appeals. Dkt. No. 9-50, p. 1708; Dkt. No. 9-53, p. 1866.

On June 6, 2012, the Court of Criminal Appeals "denied" Vasquez's applications "on findings of trial court without hearing." Dkt. No. 9-50, p. 1704; Dkt. No. 9-53, p. 1862. As considered for present purposes, Vasquez is entitled to an additional 58 days of tolling during the pendency of these applications.

Thus, Vasquez would be entitled to 214 days of tolling (156 for the Article 64 DNA motion; 58 for the state habeas petitions) after the initial deadline of September 6, 2012. This tolling produces a new deadline of April 8, 2013. Even if such an enlargement is allowed, Vasquez failed to timely file the instant petition.

Vasquez did not file his petition in this court until December 18, 2013. Dkt. No. 1. Thus, despite any leeway that may be allowed for pro se representation in the state appellate proceedings, the petition is untimely by over eight months. Given the fact that the petition was clearly untimely, the Court must determine if there are any applicable exceptions to the AEDPA's statute of limitations that would save Vasquez's claims.

Vasquez has asserted that his claims should still be considered because he is actually innocent of the crime. Dkt. No. 1. As discussed below, Vasquez has not met the high hurdle

---

[4] For the reasons discussed more fully later, this treatment does not affect the ultimate outcome in this case.

of establishing that he is actually innocent.[5]

## B. Actual Innocence

Vasquez asserts that his claims establish that he is actually innocent of the crime in question and, thus, serve to excuse his untimely filing. This claim is meritless.

The Supreme Court has held that a claim of actual innocence is a gateway to consideration of an untimely filed petition. McQuiggen, 133 S. Ct. at 1928. Despite its existence, the standard for actual innocence is quite high. Indeed, it requires "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial" Id, at 1936. Vasquez's three claims – the DNA testing, the alibi witness, and the corruption in the District Attorney's Office – both individually and collectively, fall far short of this standard.

### 1. DNA Testing

Vasquez asserts that his attorney was ineffective for not ensuring that the DNA evidence was fully re-tested by his expert. The facts mandate the conclusion that this claim does not support a finding of actual innocence.

A very small amount of DNA that did not belong to the victim was found on the knife. Dkt. No. 9-20, pp. 629. The state's expert testified that the second DNA found on the knife was consistent with Vasquez's, but admitted that there was a 1-in-8700 chance that it did not come from Vasquez. Id. The expert testified that "we can't say with any degree of certainty that [the] sample did come from [Vasquez], just that most people would have been excluded as contributors." Id, p. 630. On cross-examination, the expert admitted that out of a sample size of one million people, "some[where] in the order of a hundred" people would match that partial DNA profile. Id, pp. 647-48.

While the defense expert did not re-test the DNA, due to a "communications breakdown," it is unlikely that such re-testing would have made a difference in the case. Dkt. No. 9-21, pp. 699-700. Watts testified that based on the presence of the stutters in the DNA

---

[5] Vasquez has not raised any other possible basis for equitably tolling the limitations period and none is evident from the record.

sample, the DNA of multiple people could have been present. Id, p. 693.  She also admitted that she was unaware of any test that could reliably determine if a stutter was actually DNA from another contributor. Id, pp. 693-94.  Thus, the defense's own expert admitted that there was no reliable test to support her suppositions.

Moreover, even if it was the attorney's fault that the DNA samples were not re-tested, there is no evidence in the record that such testing would have altered the outcome of this case.[6]  Furthermore, the testimony at trial indicated that re-testing was unlikely to show a different result, given that the defense expert admitted that there was no reliable test to determine whether the DNA fragment was a stutter or the DNA of another person. Id, pp. 693-94.  Indeed, both experts agreed that there was a very small sample of DNA that could not be attributed to the victim and that Vasquez could not be ruled out as the source of that DNA. Dkt. No. 9-21, p. 693.

Unlike some other cases – for example, a single-perpetrator rape case – this is not a case where DNA would be dispositive of guilt or innocence.  There was overwhelming evidence against Vasquez in this case.  All of the eyewitnesses knew Vasquez prior to the day of the murder; thus, eyewitness misidentification was highly unlikely.  While the eyewitnesses had varied criminal histories – Ayala, Decker and Garcia were all in jail on various charges when they testified – their accounts were corroborated by independent evidence (Decker did receive a police citation that evening; the knife was found in Decker's car where Ayala told the police it would be, etc).  Thus, even if DNA testing showed that

_____

[6]  Additionally, there remains the question of whether the decision to not test was the result of a trial tactic.  If a new test revealed that the DNA definitively belonged to Vasquez, it would have completely undermined any doubts that the defense counsel could have sown about the origin of the DNA.  See, e.g., U.S. v. Henry, 849 F.2d 1534, 1541 (5th Cir. 1988) (defense attorneys know that they should not ask a question "unless the inquirer knows the answer which must be given.").  Furthermore, while the absence of DNA may not have definitively exonerated Vasquez, its unquestioned presence would have almost certainly guaranteed his conviction.  Accordingly, this Court can easily find – as the Thirteenth Court of Appeals did – that Vasquez has not established that any failure to pursue further DNA testing fell outside of the purview of acceptable trial tactics. Vasquez v. State, 2010 WL 4361877, *3 (Tex. App. Nov. 4, 2010) (unpubl.).

Vasquez's DNA was not present on the knife, it would neither alter the Court's confidence in the outcome of the trial, nor establish Vasquez's factual innocence. McQuiggin, 133 S.Ct. at 1936 (requiring "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial").

### 2. Alibi Witness

Vasquez has asserted – for the first time in any of his proceedings[7] – that he had an alibi for the night in question.  His habeas petition asserts that "Jose Luis Gutierrez, was willing, ready and able to testify that Petitioner was with him at Gutierrez's house on the alleged date and time of the murder." Dkt. No. 1, p. 23.  Gutierrez is deceased, but Vasquez asserts that Gutierrez's mother "is still alive, willing and able to provide alibi testimony at an evidentiary hearing." Id.[8]

"[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009).  Without an affidavit or similar evidence to show what a witness would have testified to, a petitioner cannot show prejudice from the attorney's failure to call the alibi witness. Sayre v. Anderson, 238 F.3d 631, 636 (5th Cir. 2001).

Vasquez has not provided an affidavit from Gutierrez's mother, explaining her

---

[7] Because this claim – and the claim of corruption – was not raised in the state courts, it is procedurally defaulted. See Mercadel v. Cain, 179 F.3d 271, 275 (5th Cir. 1999) (noting that § 2254 habeas petitioners are required to present their claims to the state courts before proceeding with them in federal court).  Vasquez asserts that his procedural default should be excused because he was unrepresented during his state appellate proceedings, citing Martinez v. Ryan, 566 U.S. —, 132 S.Ct. 1309, 1318-19 (2012).  Even if the Court excuses Vasquez's procedural default based on Martinez, the result is unchanged because his claims are substantively meritless, as set out above.

[8] Unless Gutierrez's mother was also present at the time of the alibi, there are obvious issues with her testimony being largely hearsay.

proposed testimony in detail.  Rather, he has merely stated that she would have provided an alibi on his behalf.  This conclusory statement is plainly insufficient to establish a claim of ineffective assistance.  <u>Sayre</u>, 238 F.3d at 636.

In determining whether actual innocence is appropriate, the Supreme Court has said that "unexplained delays in presenting new evidence" is a pertinent factor to consider.  <u>McQuiggin</u>, 133 S.Ct. at 1935.  Vasquez did not raise this claim in his trial proceedings; nor in his direct appeal; nor in his state habeas proceedings.  Given that Vasquez would have known about this potential witness from the start – after all, Vasquez says that he was with the witness at the time the crime occurred – the Court is left with two primary explanations for Warner's failure to call this alibi witness.  Either Vasquez never told his attorney about Gutierrez, because he wasn't with Gutierrez that day and this alibi is manufactured <u>post</u> <u>hoc;</u> or Vasquez told his attorney about Gutierrez and his attorney investigated and found the alibi to be wanting or baseless.  Neither of these outcomes are favorable to any showing of actual innocence or ineffective assistance of counsel.  <u>See</u> <u>U.S. v. Molina-Uribe</u>, 429 F.3d 514, 520 (5th Cir. 2005) (counsel is not ineffective for failing to pursue a strategy that would have "arguably" required him to suborn perjured testimony).

Furthermore, even if this alibi witness had testified, it does not rise to the level of actual innocence.  Absent independent evidence to corroborate that alibi, it would have been the word of one alibi witness against at least four other witnesses (Ayala, Garcia, Decker and the officer who pulled over Decker for the traffic violation), all of whom testified to seeing Vasquez that evening.  A jury could easily believe the State's witnesses over Vasquez.  "The jury retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses."  <u>U.S. v. Grant</u>, 683 F.3d 639, 642 (5th Cir.2012).  The jury did so in this case and nothing submitted by Vasquez establishes any reason to believe that they were wrong and that Vasquez was actually innocent.

In sum, the presence of this purported alibi witness establishes neither actual innocence nor ineffective assistance of counsel in this case.  This claim should be denied.

### 3. Corruption

Vasquez has asserted that the presence of corruption in the Cameron County District Attorney's Office, at the time of his trial, establishes actual innocence. This claim, like the others, is meritless.

While it is undoubtedly true, that the elected District Attorney at the time of the trial – Armando Villalobos – was convicted of public corruption charges, Vasquez has provided no evidence that the corruption tainted his trial. Given the nature of the charges against Villalobos – that he gave favorable treatment to certain defendants in exchange for monetary kickbacks – it would appear highly unlikely that Vasquez's trial was infected with corruption. Vasquez's brief notes that he "did not pay any bribes for favorable treatment." Dkt. No. 1, p. 9. This avails Vasquez nothing; it just means that he did not receive favorable treatment despite having committed the crime. In fact, there is no showing – or any basis upon which to suspect – that the corruption impacted his trial in any form or fashion.

In short, there is nothing in the record, nor identified outside of the record that supports this conclusory claim. "Bald assertions," without facts in the record to support them, "are insufficient to state constitutional claims." Tijerina v. Scott, 71 F.3d 878 (5th Cir. 1995) (citing Ross v. Estelle, 694 F.2d 1008, 1011-12 (5th Cir. 1983)). There is no probative evidence in the record, and none pointed to anywhere else, that supports this claim. Moreover, even if there was such evidence, Vasquez has made no showing that such corruption supports his claim that he did not commit the act for which he was convicted. See McGowen v. Thaler, 675 F.3d 482, 499-500 (5th Cir. 2012) (in order to establish actual innocence, a petitioner must show that "as a factual matter, that he did not commit the crime of conviction.").

## IV.  Recommendation

It is **RECOMMENDED** that Jose Miguel Vasquez's petition for writ of habeas corpus by a person in state custody pursuant to 28 U.S.C. § 2254 be **dismissed** for being untimely filed and lack of jurisdiction.

### A. Certificate of Appealability

Unless a circuit justice or judge issues a Certificate of Appealability ("COA"), a petitioner may not appeal the denial of a § 2254 motion to the Court of Appeals. 28 U.S.C. § 2253(c)(1)(A). A petitioner may receive a COA only if he makes a "substantial showing of the denial of a constitutional right." § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). To satisfy this standard, a petitioner must demonstrate that jurists of reason could disagree with the court's resolution of his constitutional claims or that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further. Id. at 327; Moreno v. Dretke, 450 F.3d 158, 163 (5th Cir. 2006). "Importantly, in determining this issue, we view the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." Druery v. Thaler, 647 F.3d 535, 538 (5th Cir. 2011) (internal quotations omitted) (citing Barrientes v. Johnson, 221 F.3d 741, 772 (5th Cir.2000)). The district court must rule upon a certificate of appealability when it "enters a final order adverse to the applicant." Rule 11, Rules Governing § 2254 Petitions.

After reviewing Vasquez's § 2254 motion and the applicable Fifth Circuit precedent, the Court is confident that no outstanding issue would be debatable among jurists of reason. Although Vasquez's § 2254 motion raises issues that the Court has carefully considered, he fails to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Accordingly, it is **RECOMMENDED** that a COA should be denied.

### B. Notice to Parties

The parties have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Andrew S. Hanen, United States District Judge. 28 U.S.C. § 636(b)(1) (eff. Dec. 1, 2009). Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. See § 636(b)(1); Thomas v Arn, 474 U.S. 140, 149 (1985);

Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1428-29 (5th Cir. 1996), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

DONE at Brownsville, Texas, on April 21, 2016.

Ronald G. Morgan
United States Magistrate Judge